## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

KENNETH SEAGROVES,

      Plaintiff,

v.                                        CV 09-1182 WPL

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

      Defendant.


### ORDER

In February 2001, Kenneth Seagroves applied for supplemental security income and disability insurance benefits. (Administrative Record (AR) 448.) After the applications were denied at the initial, reconsideration, and hearing levels, the Appeals Council remanded the matter to the administrative law judge (ALJ) for further proceedings. An ALJ again denied the applications in a decision that was upheld by the Appeals Council. However, this Court reversed and remanded the matter for additional proceedings. (*Id.*) The ALJ conducted another hearing and denied benefits for the third time. (AR 448-62.) The Appeals Council denied review (AR 420-22), and Seagroves brought this proceeding for judicial review of the ALJ's third decision. The case is before me now on Seagroves's motion to reverse and remand, a response filed by the Commissioner of Social Security, and Seagroves's reply. (Doc. 15, 17, 18.) For the reasons explained below, I will grant the motion.

### STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v.*

*Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004).  Substantial evidence is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion.  *Id.*  A decision is not based

on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere

scintilla of evidence supporting it.  *Id.*  I must meticulously examine the record, but I may neither

reweigh the evidence nor substitute my discretion for that of the Commissioner.  *See id.*

### SEQUENTIAL EVALUATION PROCESS

The Social Security Administration has devised a five-step sequential evaluation process to

determine disability.  *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520,

416.920.  At the first four steps, the claimant must show that he is not working at a substantial

gainful activity, that he has an impairment that is severe enough to significantly limit his ability to

do basic work activities, and either that the impairment meets or equals an impairment listed in 20

C.F.R. Part 404, Subpart P, Appendix 1, or that he is unable to perform the work he has done in the

past.  At the fifth step, the Commissioner must show that the claimant is capable of performing other

jobs existing in significant numbers in the national economy.  *See Thomas*, 540 U.S. at 24-25; *see*

*also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential

evaluation process in detail).

The Contract with America Advancement Act of 1996 modified the sequential evaluation

process for cases in which the claimant suffers from alcoholism or drug addiction.  Pursuant to the

Act, "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would

. . . be a contributing factor material to the Commissioner's determination that the individual is

disabled."  42 U.S.C. § 423(d)(2)(C); *see also Salazar v. Barnhart*, 468 F.3d 615, 622-23 (10th Cir.

2006).  A finding of disability is a condition precedent to application of the Act.  *Drapeau v.*

*Massanari*, 255 F.3d 1211, 1214 (10th Cir. 2001).  Accordingly, the ALJ must first complete the

2

five-step sequential evaluation process.  If that process results in a finding of disability, the ALJ must then determine whether the claimant would still be found disabled if he stopped abusing alcohol or drugs.  *See id.*  "[T]he ALJ must evaluate which of plaintiff's current physical and mental limitations would remain if plaintiff stopped using alcohol [or drugs], and then determine whether any or all of plaintiff's remaining limitations would be disabling."  *Id.*  If the claimant would still be found disabled if he stopped using alcohol or drugs, substance abuse is not a contributing factor material to the finding of disability.  Conversely, if the claimant would not be found disabled if he stopped using alcohol or drugs, substance abuse is a contributing factor material to the finding of disability.  *See id.* at 1214-15.

When a claimant suffers from another mental disorder besides substance addiction, the ALJ must find that substance addiction is not material to the claimant's disability unless the limitations caused by substance addiction can be separated from those caused by the other mental disorder.  *Salazar*, 468 F.3d at 623.  A medical expert must be able to project what limitations would remain if the claimant stopped using drugs or alcohol.  *Id.*  "[T]he key factor the Commissioner must examine in determining whether drugs or alcohol are a contributing factor to the claim is whether the Commissioner would still find the claimant disabled if he or she stopped using drugs or alcohol."  *Drapeau*, 255 F.3d at 1214.

## FACTUAL BACKGROUND

Seagroves has a history of seizures.  In November 2000, he had a seizure while working at a construction site, fell from some scaffolding, and broke his neck.  (AR 130.)  On November 29, 2000, he underwent surgery for this injury, including a diskectomy and a spinal fusion.  (AR 133.)  His doctor opined that he would be unable to work for at least eighteen months after the surgery.

(AR 141.)  But after examining Seagroves in March 2001, the doctor noted that the fracture had completely healed.  (AR 139.)

The record reflects that Seagroves has degenerative disc disease.  (AR 173, 551.)  He has sought treatment for joint and muscle pain and spasms, including pain in his knees.  (AR 186, 294, 517.)

In May 2001, a medical consultant completed a physical residual functional capacity assessment for Seagroves.  (AR 267.)  The doctor found that he could lift or carry ten pounds frequently and twenty pounds occasionally, and could stand, walk, or sit for about six hours in an eight-hour workday.  (AR 268.)  Because of his history of seizures, he could never climb ramps, stairs, ladders, ropes, or scaffolds.  (AR 269.)

Seagroves also suffers from substance addiction, particularly alcohol.  He underwent inpatient treatment for his addictions at Turquoise Lodge between June 18th and August 8th, 2002. (AR 199.)  His discharge summary indicates that he has a mood disorder and a seizure disorder that are separate from his substance abuse.  (*Id.*)  A doctor there diagnosed him with a hypomanic mood disorder.  (AR 219.)  Seagroves did well at Turquoise Lodge, completing 95% of his treatment goals.  He was motivated and seemed to want to recover.  (AR 199.)  Nevertheless, it does not appear that he managed to stay sober after leaving Turquoise Lodge.  (*See, e.g.,* AR 546.)

In March 2003, Dr. Sacks performed a consultative psychiatric examination on Seagroves. (AR 248.)  Seagroves told Sacks that he may have been diagnosed previously with "hypomania." (AR 252.)  Sacks thought it would be a good idea to assess whether Seagroves has bipolar disorder, although he doubted that Seagroves had that condition.  Instead, Sacks believed that Seagroves might have cyclothymia, which is a mood disorder involving numerous periods of hypomanic

4

symptoms.  (AR 252-53, 457.)   Sacks stated that it was difficult for him to make a diagnosis of bipolar disorder because of the "polysubstance [sic] and alcoholism in the past."  (AR 252.)

The next month, Dr. Gabaldon completed a psychiatric review technique form for Seagroves. (AR 275.)   In accordance with Dr. Sacks's report, Dr. Gabaldon stated that Seagroves has cyclothymia.  (AR 278.)

Seagroves gets treatment for his various problems at Healthcare for the Homeless.  In January 2004, he underwent a psychiatric evaluation there.  The doctor diagnosed him with bipolar disorder, depression, and alcohol dependence.  (AR 292-93.)  In October 2005, a social worker at Healthcare for the Homeless diagnosed Seagroves with "bipolar affective disorder, manic, severe." (AR 358.)  In September 2007, Seagroves's treating physician at Healthcare for the Homeless completed a form stating that Seagroves was temporarily disabled for six months due to bipolar disorder, anxiety, and pain.  (AR 507.)

Seagroves underwent three evaluations in April 2008.  First, x-rays were taken of his spine, shoulders, hands, and knees.  (AR 550.)  The x-rays revealed "extensive degenerative changes in the cervical spine," minimal degenerative changes in the shoulders, osteoarthritis in both hands, and evidence of prior degenerative changes and loss of joint space in the left knee "with periarticular calcification."  (AR 551.)

A few weeks after the x-rays were taken, Dr. Burger performed a physical examination.  (AR 546.)  He concluded that Seagroves "functions relatively well" and "is employable for gainful employment."  (AR 549.)

Finally, Seagroves had a psychiatric evaluation at a hospital affiliated with the University of New Mexico.  (AR 539.)  The doctors diagnosed him with bipolar affective disorder, in addition to alcohol and cannabis dependence.  (AR 541.)  His insight and judgment were poor to fair.  (*Id.*)

**ALJ'S DECISION**

The ALJ conducted a hearing in which Seagroves and a vocational expert (VE) testified. (AR 553-85.) She then issued a decision denying benefits. After proceeding quickly through the first three steps, which are not challenged here, the ALJ concluded at step four that Seagroves has the following physical RFC:

> [H]e can lift and carry up to twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours in an eight-hour work day, sit up to six hours in an eight-hour work day, and he can push and pull with the upper and lower extremities in a manner consistent the strength limitations just stated. He can handle, finger, and reach no more than frequently. He cannot climb ropes, ladders, or scaffolds, but can occasionally climb ramps and stairs, and occasionally crouch, crawl, balance, stoop, and kneel. He has no environmental restrictions other than the need to avoid even moderate exposure to unprotected heights and hazardous moving machinery.

(AR 453.) The ALJ concluded that Seagroves lacks the requisite minimum mental ability to sustain employment when his substance abuse is considered. However, if he abstained from substance abuse, he would have the following mental RFC:

> [H]e would be limited to simple, unskilled instructions and tasks in an object-focused environment with no more than minimal collaboration with coworkers and supervisors, and incidental, infrequent and superficial contact with the public.

(*Id.*)

In arriving at the physical RFC, the ALJ considered the medical opinions set forth in the Factual Background above and expressly relied on the medical consultant's May 2001 physical residual functional capacity assessment. (AR 454-55.) In arriving at the mental RFC, she discussed all of the evidence set forth above. (AR 456-59.) In findings that are unchallenged here, the ALJ determined that Seagroves's testimony was not fully credible and she rejected the social worker's October 2005 report and the April 2008 psychiatric evaluation. (AR 456-57.) She concluded that

6

although the ongoing substance abuse was his most limiting impairment, Seagroves would still have a mood disorder if he stopped abusing alcohol and other substances. (AR 458.)

As a result of his physical RFC, the ALJ concluded that Seagroves could not do his past relevant work in construction, regardless of his substance abuse. (AR 460.) Turning to step five, she concluded that Seagroves was incapable of performing other jobs existing in significant numbers in the national economy as long as he engages in substance abuse. (*Id.*) But, based on the VE's testimony, he could perform a significant number of jobs in the national economy if he stopped abusing substances. (AR 461.) Because Seagroves would not be disabled without his substance abuse, his substance use disorder is a contributing factor material to the determination of disability. The ALJ therefore denied benefits. (AR 462.)

### MENTAL RFC AND MATERIALITY FINDING

Seagroves contends that the ALJ's materiality finding is contrary to law. He points out that he still needed medication for bipolar disorder when he was released clean and sober from Turquoise Lodge (*see* AR 228), thus demonstrating that this disorder is a separate condition from his substance abuse. He also notes that the diagnosis of bipolar disorder was listed first, before the diagnosis of substance abuse, in 2004 and 2008. (*See* AR 293, 541.) He asserts that because bipolar disorder was listed first it is the principal diagnosis pursuant to diagnostic protocol. *See* AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 27 (4th ed. text rev. 2000) (hereafter DSM-IV-TR).

Seagroves seems to believe that these facts show that the effects of bipolar disorder cannot be separated from the effects of substance abuse. What they actually show is simply that Seagroves has a co-existing mental impairment. The fact that he needed medication for this impairment and that it is purportedly the principal diagnosis do not necessitate a finding that it is individually

disabling.  *Cf. Alexander v. Shalala*, 927 F. Supp. 785, 792 (D.N.J. 1995) ("In order for a person to be found disabled within the meaning of the Act, it is not sufficient that the evidence establish the mere presence of a disease or impairment.").

Next, Seagroves criticizes the ALJ for failing to mention two below-fifty global assessment of functioning (GAF) scores.  (*See* AR 293, 541.) These scores represent serious symptoms or serious impairment in social, occupational, or school functioning.  *See* DSM-IV-TR, *supra*, at 34. Seagroves has not cited, and I am not aware of, any binding authority requiring an ALJ to address GAF scores.  In unpublished decisions, the Tenth Circuit has noted that a GAF may indicate problems that do not relate to the ability to hold a job and has indicated that the mere failure to discuss the GAF is not ordinarily sufficient to reverse an ALJ's decision.  *See, e.g., Camp v. Barnhart*, 103 F. App'x 352, 354 (10th Cir. 2004) (suggesting that a GAF of fifty, standing alone, did not establish an inability to work).  *But see Lee v. Barnhart*, 117 F. App'x 674, 678 (10th Cir. 2004) (stating that a below-fifty GAF should not have been ignored in a case decided at step two); *Berryhill v. Barnhart*, 64 F. App'x 196, 200 (10th Cir. 2003) (remanding because the ALJ credited two references to a GAF of sixty, which represents only moderate problems, while ignoring eight other GAF scores that were fifty or less).  Moreover, one of the GAF scores cited by Seagroves refers to a time when his substance abuse was ongoing.  (*See* AR 540-41.)  This score does not help in separating the effects of substance abuse from the co-existing mood disorder.

Seagroves's next argument has merit.  He points out that the ALJ found that he would have moderate difficulty in maintaining concentration, persistence or pace, even without ongoing substance abuse.  Yet the RFC finding only limited him to simple, unskilled instructions and tasks in an object-focused environment with no more than minimal collaboration with coworkers and

8

supervisors, and incidental, infrequent and superficial contact with the public.  Seagroves relies on *Wiederholt v. Barnhart*, 121 F. App'x 833 (10th Cir. 2005).

In *Wiederholt*, the ALJ found that the claimant had an RFC limited to "simple, unskilled job tasks."  121 F. App'x at 839.  But the ALJ also found that the claimant had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  The ALJ's hypothetical question to the vocational expert (VE) included only the limitation of "simple, unskilled" tasks.  *Id.*  Based on this question, the VE opined that the claimant could do unskilled work.  The ALJ relied on the VE's opinion in denying benefits.  *Id.*  The Tenth Circuit held that "[t]he relatively broad, unspecified nature of the description 'simple' and 'unskilled'" did not adequately incorporate the ALJ's other specific findings regarding the claimant's mental impairments.  *Id.*  "Because the ALJ omitted, without explanation, impairments that he found to exist, such as moderate difficulties maintaining concentration, persistence, or pace, the resulting hypothetical question was flawed."  *Id.* Accordingly, the VE's opinion did not constitute substantial evidence to support the ALJ's decision. *Id.*; *accord Smith v. Barnhart*, 172 F. App'x 795, 800 (10th Cir. 2006) (holding that a hypothetical question was flawed where it stated that the claimant could understand and perform simple tasks but did not mention the claimant's moderate limitations in concentration, persistence, or pace).

*Wiederholt* is not binding precedent, but has persuasive value, particularly in the absence of any published opinion from the Tenth Circuit on this issue.  *See* 10TH CIR. R. 32.1(A).  The Third, Seventh, and Eighth Circuits have reached similar conclusions in published cases, which also have persuasive value.  *See Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003); *Newton v. Chater*, 92 F.3d 688, 694-95 (8th Cir. 1996); *see also Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009) ("The Commissioner continues to defend the

9

ALJ's attempt to account for mental impairments by restricting the hypothetical to 'simple' tasks, and we and our sister courts continue to reject the Commissioner's position."). Likewise, I have previously remanded a case in which the ALJ found that a claimant "has moderate difficulties with concentration, persistence or pace and as a result, is limited to jobs involving simple and routine tasks." *Chavez v. Astrue*, No. CV 08-1103 WPL (D.N.M. Jan. 5, 2010).[1]

The Commissioner argues that *Wiederholt* is distinguishable because the hypothetical in this case was not broad or unspecified, but rather incorporated the complete RFC. The ALJ's hypothetical described a person who "is limited to simple instructions and tasks with no more than minimal collaboration with coworkers and supervisors, no more than infrequent incidental and superficial contact with the public in work that is object focused." (AR 581.) Although this hypothetical contains more limitations than the one in *Wiederholt*, nothing in the hypothetical addresses the moderate difficulties in maintaining concentration, persistence, or pace.

The Commissioner further argues that the finding of moderate difficulties in concentration, persistence, or pace relates only to steps two and three of the sequential evaluation. Pursuant to Social Security Ruling (SSR) 96-8p, this finding is not part of the RFC assessment at steps four and five, and therefore, the Commissioner argues, the ALJ properly omitted it from Seagroves's RFC. This argument has been rejected by the Third Circuit. The court noted that although SSR 96-8p states that the finding is not part of an RFC assessment, it does not follow that the finding plays no role at steps four and five, and the ruling contains no such prohibition. *See Ramirez*, 372 F.3d at 555. In fact, as the Third Circuit noted, the ruling requires a "'more detailed assessment'" at step

---

[1] Although there are cases reaching different results, a recent decision by the Eleventh Circuit shows that all of the cases can be reconciled. *See Richter v. Comm'r of Soc. Sec.*, No. 09-12674, 2010 WL 2017650, at *2 (11th Cir. May 21, 2010) (unpublished).

four.  *Id.* (quoting SSR 96-8p); *see also Kasarsky*, 335 F.3d at 543-44 (remanding where, as in this case, the ALJ found significant deficiencies in concentration, persistence, or pace, but failed to incorporate that finding into either the RFC or the hypothetical).

The Third Circuit also noted that "[m]any employers require a certain output level from their employees over a given amount of time, and an individual with deficiencies in pace might be able to perform simple tasks, but not over an extended period of time."  *Ramirez*, 372 F.3d at 554. Similarly, citing a VE's testimony, the Eighth Circuit has stated that concentration and persistence problems relate to basic work habits needed to maintain employment and that a moderate deficiency in these areas would cause problems on a daily basis regardless of the skills required for a job. *Newton*, 92 F.3d at 695; *see also Bowers v. Astrue*, 271 F. App'x 731, 733 (10th Cir. 2008) (citing *Newton* for the proposition that "[s]imple work . . . can be ruled out by a vocational expert on the basis of a serious impairment in concentration and attention").

Accordingly, the ALJ erred by failing to account for Seagroves's moderate difficulties in concentration, persistence, or pace in the RFC or to incorporate the finding into the hypothetical. This error does not, however, require a reversal and remand for the payment of benefits.  In deciding whether to order the payment of benefits, the Tenth Circuit considers the length of time the matter has been pending and whether, given the available evidence, remand for additional fact-finding would serve any useful purpose or would merely delay the receipt of benefits.  *Salazar*, 468 F.3d at 626.  This case has been pending for an egregiously long time—Seagroves filed his applications for benefits in February 2001—and the delays are mainly attributable to the Social Security Administration.  In addition to the errors made in the first two decisions, over a year passed between the last administrative hearing and the issuance of the third ALJ's decision.  But I cannot say that a remand would be useless or that the award of benefits is inevitable.  *Cf. Frey v. Bowen*, 816 F.2d

508, 518 (10th Cir. 1987) (remanding for an award of benefits where "[a] review of the record as a whole only support[ed] the conclusion that [the claimant was] disabled").

Seagroves also argues that the ALJ's mental RFC assessment is flawed because she failed to conduct a function-by-function analysis of his limitations as required by SSR 96-8p.  According to the ruling,  "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  The ruling provides that an RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing both medical and nonmedical evidence.  As Seagroves acknowledges, the ALJ's decision includes a narrative discussion of the evidence.  But, according to Seagroves, the ALJ failed to show how the evidence supports her conclusions except with regard to social interaction.  Even as to that conclusion, Seagroves contends that the evidence cited by the ALJ is insufficient to show that he had no significant problems with social interaction.

The ALJ clearly included limitations regarding two of the functions mentioned in SSR 96-8p in her mental RFC assessment.  Specifically, she restricted Seagroves to work involving simple instructions and requiring only limited involvement with supervisors, coworkers, and the public.  Although she assigned an RFC for only limited involvement with others, the ALJ stated at step two that "treatment records from his stay at the Turquoise Lodge and the evaluation by Dr. Sacks, during times of abstinence, do not describe significant problems with social interaction."  (AR 452.)  Seagroves attacks this statement on the basis of two Turquoise Lodge progress notes.  One of those notes stated that he was complaining of anxiety and racing thoughts and that he had hypomania and a GAF of 45.  (AR 219.)  The other states that Seagroves was emotional, anxious, and did not want

to attend a class.  (AR 207.)  Despite these two notations, a review of all the progress notes supports the ALJ's statement.  (*See, e.g.,* AR 202, 204, 208, 209, 212, 213, 215, 216, 220, 224 (describing Seagroves as pleasant and interacting well with others, with a positive attitude and interest in attending classes).)

The RFC assigned by the ALJ does not address Seagroves's abilities to deal with changes in a routine work setting or to use judgment in making work-related decisions.  On remand, the ALJ should address these functions.[2]

## PHYSICAL RFC

Seagroves faults the ALJ for not including a manipulative limitation resulting from his hand and arm pain, cramping, and numbness.  Seagroves testified that he gets numb and has difficulty holding on to a button, zipper, or other things, but that the problem with his hands was not his most pressing issue.  (AR 571, 574.)  The ALJ considered this testimony in her decision.  (AR 455.)  But she also considered the report by Dr. Burger, who examined Seagroves in April 2008.  (*Id.*)[3]

The ALJ noted that Burger found that Seagroves had relatively good functioning in his upper extremities.  (*Id.*)  Indeed, Burger found no edema, cyanosis, clubbing, swelling, redness, or effusions in Seagroves's extremities.  He also found that Seagroves had relatively normal movement at the elbows, forearms, wrists, and shoulders and a relatively strong grip—4/5 to 5 right and left.  (AR 548.)  However, because the x-rays taken in the same month as Burger's examination showed

---

[2] The ALJ seemed to believe that Seagroves suffers from hypomania. "Mania" is characterized by, among other things, irritability, flight of ideas, distractibility, and poor judgment. STEDMAN'S MEDICAL DICTIONARY 1062 (27th ed. 2000). "Hypomania" refers to a mild degree of mania. *Id.* at 862.

[3] Seagroves suggests that Burger's findings are entitled to little weight because they relate to his functioning in 2008, whereas his last date of insured status was in 2005. It does not help Seagroves's cause to focus on the timeline. He testified at the March 2008 hearing that he noticed the difficulties with gripping "just lately." (AR 574.)

degenerative changes in Seagroves's hands, the ALJ determined that the evidence supports some limitations for handling, reaching, and fingering. (AR 455.) In her physical RFC finding, the ALJ limited these functions to no more than frequently. (AR 453.) Because the ALJ in fact included a manipulative limitation and cited medical evidence to support it, Seagroves's complaint in this regard is unfounded.

Seagroves also asserts that the ALJ's physical RFC finding is contrary to law because there is no positive evidence that he can perform the functions included in the RFC finding. *See Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996) ("[T]he absence of conclusive medical evidence cannot meet the [Commissioner's] step-five burden, even when a claimant has been found not to be credible."). The ALJ cited the medical consultant's May 2001 physical residual functional capacity assessment as support for her RFC finding. (AR 454-55.) This assessment appears on a Social Security Administration form. The medical consultant checked boxes on the form to indicate Seagroves's abilities in various functional areas. With the exception of one function discussed below, the ALJ's physical RFC finding is consistent with the medical consultant's assessment. However, because the consultant did not treat Seagroves and provided very little explanation for his assessment, the checkbox form, standing alone, is not substantial evidence. *Drapeau*, 255 F.3d at 1214; *Frey*, 816 at 515.

The ALJ also discussed Dr. Burger's report, which noted that Seagroves had no significant scoliosis in the spine and no sacroiliac tenderness. Additionally, Seagroves had a smooth, normal gait. (AR 548.) His lumbar spine, hips, knees, and ankles were normal. His cervical spine, however, had some decrease in range of motion—approximately two-thirds of what it should be. Flexion was approximately 35-40/50, extension was approximately 40/60, lateral flexion was approximately 30/45, and rotation was approximately 60/80 right and left. (*Id.*) Seagroves

14

apparently told the doctor that he can stand for hours at a time; walk for a couple of miles; and sit for half of a day, then move around and re-sit.  There were no specific neck, back, or extremity pains that limited him in this regard.  (AR 547.)[4]

Burger's findings support the earlier physical residual functional capacity assessment and the two reports together constitute substantial evidence for the ALJ's RFC finding, with one exception.  The ALJ found that Seagroves cannot climb ropes, ladders, or scaffolds, but can occasionally climb ramps and stairs.  Burger did not make any findings regarding the effect of Seagroves's seizures, but the 2001 physical residual functional capacity assessment stated that he could never climb ramps and stairs, as well as ropes, ladders, and scaffolds, due to his seizure disorder.  (AR 269.)  Although the ALJ credited the 2001 assessment, she did not explain why she deviated from it in this regard.  Considering Seagroves's undisputed history of seizures, the ALJ should revisit this issue on remand.

## CONCLUSION

For the reasons stated above, the motion to reverse and remand is granted, and this matter is remanded for proceedings consistent with this order.

IT IS SO ORDERED.

---

[4] At the administrative hearing one month before Burger's examination, Seagroves was unable to provide specifics regarding how long he can sit, stand, and walk.  But he testified that his knees bother him if he sits or walks for too long and that he sometimes has a problem standing.  (AR 576-77.)  He estimated that his backpack weighs ten pounds and that he can pick it up and carry it "[f]or the most part."  (AR 578.)  He stated, "I'm not saying it's impossible.  I'm just saying I always want to take a load off, take a break.  I wanted to move around, sit down, changing my position all the time." (*Id.*)  At a previous hearing in October 2005, he testified that he could sit or stand for half an hour at a time and could walk five blocks. (*Id*. 414-15.)  He said his backpack weighed ten-to-twenty pounds and that carrying it caused his neck and shoulders to ache. (*Id.* 416.)

_____
WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE